O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARSHALL SALKIN AND ELLEN SALKIN, | ) ) ) | Case No. EDCV 10-01322 VAP(OPx) |
| Plaintiffs, | ) ) | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) ) | **[Motion filed on November 7, 2011]** |
| UNITED SERVICES AUTOMOBILE ASSOCIATION; USAA LIFE INSURANCE COMPANY; AND DOES 1 THROUGH 50, INCLUSIVE, | ) ) ) ) | |
| Defendants. | ) | |
| _____ | | |

Plaintiff Dr. Marshall Salkin, when he learned of his terminal prostate cancer, sought an accelerated death benefit under a life insurance policy he bought from Defendant USAA Life Insurance Company ("USAA").  USAA did not pay the benefit; instead, it rescinded Dr. Salkin's policy on the basis that Dr. Salkin made misrepresentations when he applied for the policy.  Dr. Salkin and his wife, Plaintiff Ellen Salkin (the beneficiary of Dr. Salkin's policy), sued USAA, contending USAA rescinded the policy wrongfully.  USAA

filed the instant Motion for Summary Judgment ("Motion") (Doc. No. 32) on November 7, 2011, arguing it was within its rights to rescind Dr. Salkin's policy, based on significant misrepresentations Dr. Salkin made in his application.

The Court concludes Dr. Salkin made material misrepresentations in his life insurance application; consequently, USAA was within its rights to rescind Dr. Salkin's policy.  As a result, the Salkins' claim for breach of duty of good faith and fair dealing fails as a matter of law.[1]  Accordingly, for the reasons discussed below, the Court GRANTS USAA's Motion for Summary Judgment.

## I. BACKGROUND

### A.   Preliminary Evidentiary Issues

Before recounting the undisputed facts, the Court takes up the parties' objections to the evidence.  The Salkins posed only one evidentiary objection (see Doc. No. 41), i.e., the medical records submitted as Exhibit F to the Declaration of Tammy Koenig are inadmissible

---

[1] The Salkins also seek relief from rescission under California Civil Code § 1692, but it is undisputed USAA returned Dr. Salkin's premium payments when it rescinded his policy, thereby putting the Salkins back in the same position from which they started.  (See Ex. G to Koenig Decl. (Doc. No. 52-8) at 181.)  Moreover, the Salkins did not oppose USAA's Motion for Summary Judgment on this claim.

1   hearsay under the Federal Rules of Evidence, and further,

2   are inadmissible as "records containing opinions

3   concerning a person's mental state" under California law.

4   The Court sustains the hearsay objection pursuant to the

5   Federal Rules of Evidence.  Although anything Dr. Salkin

6   told his physicians for the purpose of diagnosis is

7   hearsay subject to an exception, see Fed. R. Evid.

8   803(4), the medical records in which those statements

9   (and other information) are now contained are also

10  hearsay, and without "the testimony of the custodian or

11  another qualified witness" that the records were made

12  contemporaneously with Dr. Salkin's visits and in the

13  regular course of business, Fed. R. Evid. 803(6), the

14  medical records fall outside the business records

15  exception to the hearsay rule.  As USAA failed to provide

16  the declaration of a custodian as to the provenance of

17  the medical records, to the extent USAA's Motion relies

18  upon Dr. Salkin's medical records, it may not do so in a

19  manner that assumes their accuracy.

20

21      Next, the Court turns to USAA's objections (Doc. No.

22  46), chiefly that the Salkins failed to authenticate

23  properly virtually all of the evidence submitted in

24  opposition to summary judgment.  The Court's Standing

25  Order (Doc. No. 8), sent to all parties on September 2,

26  2010, states (in relevant part):

27

28

Parties offering evidence in support of, or in opposition to, a Rule 56 motion must cite to specific page and line numbers in depositions and paragraph numbers in affidavits.  <u>Furthermore, such evidence must be authenticated properly</u>.  The Court directs the parties to become familiar with <u>Orr v. Bank of America, NT & SA</u>, 285 F.3d 764 (9th Cir. 2002).

(emphasis added).

<u>Orr</u> deals extensively with the subject of proper authentication of documents submitted in conjunction with summary judgment proceedings, which "must be 'attached to an affidavit that meets the requirements of Fed. R. Civ. P. 56[(c)(4)] and the affiant must be a person through whom the exhibits could be admitted into evidence.'"  285 F.3d at 774 (quoting <u>Canada v. Blain's Helicopters, Inc.</u>, 831 F.2d 920, 925 (9th Cir. 1987)).

Here, the Salkins seek to admit various documents based on the declaration of their counsel that the documents are authentic.  (<u>See, e.g.</u> Corby Decl. (Doc. No. 53-1) ¶ 8.)  To make such a declaration effectively, however the authenticating witness must have personal knowledge that the document is what it purports to be, <u>e.g.</u>, because he wrote it, signed it, used it, or saw others do so.  <u>Orr</u>, 285 F.3d 774 n.8.  There is no

1  indication that Corby, the Salkins' attorney, has
2  personal knowledge that (for example) what he declares is
3  an electronic mail message ("email") between two USAA
4  employees is actually a true and correct copy of that
5  email.

6

7      Of course, a party may authenticate a document by
8  virtue of the fact the document was produced in discovery
9  "when the party identifies who produced the document, or
10 if the party opponent admits to having produced it."
11 Barefield v. Bd. of Trustees of Cal. State Univ.,
12 Bakersfield, 500 F. Supp. 2d 1244, 1257-58 (E.D. Cal.
13 2007) (citing Orr, 285 F.3d 777-78). While it appears
14 from the Bates stamps on the proffered documents that
15 USAA produced them, Corby did not so declare;
16 consequently, the documents may not be authenticated by
17 production.

18

19     Nevertheless, the Court overrules USAA's objections.
20 To the extent USAA proffered some of the same evidence as
21 have the Salkins, "[o]nce evidence has been authenticated
22 by one party, it has been authenticated with regard to
23 all parties," Barefield, 500 F. Supp. 2d at 1258 (citing
24 Orr, 285 F.3d at 775-76), and in any event, USAA does not
25 actually contest the authenticity of the evidence at
26 issue, just the Salkins' failure to authenticate it
27 properly.  See Metro-Goldwyn-Mayer Studios, Inc. v.
28

1    _Grokster_, 454 F. Supp. 2d 966, 972 (C.D. Cal. 2006)

2    (citing _Maljack Prods., Inc. v. GoodTimes Home Video_

3    _Corp._, 81 F.3d 881, 889 n.12 (9th Cir. 1996)) (holding

4    that an objection to a party's failure to authenticate

5    documents, without a corresponding denial of the

6    documents' authenticity, is insufficient to exclude

7    documents produced in discovery by the objecting party).

8

9       Having thus dispensed with the parties' evidentiary

10   objections, the Court now turns to the facts of the case

11   before it.

12

13   **B.   Factual Background**

14      Dr. Salkin, a retired Navy commander and physician,

15   first applied for a life insurance policy from USAA in

16   September 2007.  (_See_ Koenig Decl. (Doc. No. 52) ¶ 2.)

17   Based on Dr. Salkin's representation in a telephone

18   interview that his father died of a heart attack, and an

19   electrocardiogram ("EKG") – performed at USAA's request –

20   that showed Dr. Salkin had a right bundle branch block,[2]

21   USAA offered Dr. Salkin a policy at an increased premium.

22   (Koenig Decl. ¶ 2.)  Dr. Salkin declined the offer.  (_Id._

23

24   _____

25      [2] "Bundle branch block is a condition in which
     there's a delay or obstruction along the pathway that
     electrical impulses travel to make your heart beat.  The
26   blockage may occur on the pathway that sends electrical
     impulses to the left or the right side of your heart."
27   _Bundle Branch Block: Definition_,
     http://www.mayoclinic.com/health/bundle-branch-
28   block/DS00693 (last visited Dec. 5, 2011).

¶ 3.)   In May 2008, Dr. Salkin applied again, but because of the amount of time that had elapsed since his first application, he was required to undergo new laboratory tests, and to submit to another telephone interview. (Id. ¶¶ 4-5.)

The following relevant colloquies occurred in the 2008 telephone interview:

Interviewer:        And have you ever consulted with a
                    health care provider for a seizure,
                    paralysis, stroke, depression,
                    anxiety or other mental or nervous
                    system disorder?
Dr. Salkin:         No.
. . .
Interviewer:        Chest pain, high blood pressure,
                    murmur, heart attack or other heart
                    or blood vessel disorder?
Dr. Salkin:         Okay, I have a history of high blood
                    pressure.
. . .
Interviewer:        And what is the name of the doctor
                    or facility named that would have a
                    record for this?
Dr. Salkin:         Let's see, I'm a doctor so, I doctor
                    myself.

```
 1      Interviewer:        So you have your own medical records
 2                          for your high blood pressure?
 3      Dr. Salkin:         I don't have any records, no.
 4      . . .
 5      Interviewer:        Within the past five years, have you
 6                          had an electrocardiogram, x-ray or
 7                          any other diagnostic tests or
 8                          procedure that was –
 9      Dr. Salkin:         Yeah, I did an EKG to my insurance
10                          physical.
11      . . .
12      Interviewer:        Any other diagnostic tests or
13                          procedure?
14      Dr. Salkin:         No.
15      . . .
16      Interviewer:        And have you consulted a health care
17                          provider for any reason not
18                          previously disclosed?
19      Dr. Salkin:         No.
20      . . .
21      Interviewer:        And some of your answers indicate
22                          that USAA Life Insurance Company
23                          will need to obtain a copy of your
24                          medical records to better evaluate
25                          your application, and I will now –
26      Dr. Salkin:         I don't have any medical records.
27   (Ex. B to Belke Decl. (Doc. No. 51) at 14-22.)
28
```

1    Dr. Salkin then underwent another physical

2   examination and laboratory tests (Koenig Decl. ¶ 7);

3   based on the information gleaned from the examination,

4   tests, and his interview, Dr. Salkin was offered a "10

5   year level term life insurance policy at a Table B

6   rating, with a face amount of $500,000."  (<u>Id.</u> ¶ 8.)[3]

7   Dr. Salkin's policy contained a clause by which USAA

8   promised:

9

10       not [to] contest this policy based on statements

11       made in an application after this policy has been

12       in effect during the insured's lifetime for 2

13       years from the Effective Date. . . .  While this

14       policy is contestable, [USAA] may rescind the

15       policy or deny a claim on the basis of a material

16       misstatement in the application.

17   (Ex. B to Koenig Decl. at 101.)

18

19    In November 2009, Dr. Salkin was diagnosed with stage

20   IV prostate cancer. (Ex. C to Koenig Decl. at 122-28.)

21   In December, he submitted a claim under his USAA life

22   insurance policy for a $250,000 accelerated death

23

24   _____

25    [3] Salkin disputes this fact based on an internal USAA
    communication, which states "[Salkin] first applied with
    us September 2007 and based on reported history of
26   positive family history and our routine ecg showing CRBBB
    a table B was assessed.  A final counteroffer was made
27   11/8/07."  (Ex. G. to Corby Decl. (Doc. No. 53-3).)
    Nothing about this statement contradicts USAA's proffered
28   fact.

1  benefit.  (Id.)  In conjunction with that claim, Mrs.
2  Salkin faxed USAA a document containing, among other
3  things, the name of Dr. Salkin's health insurer.  (Ex. D
4  to Koenig Decl.)  As Dr. Salkin's claim came within two
5  years of the effective date of his policy, i.e., during
6  the policy's contestability period, USAA conducted a
7  "routine contestable investigation" (Koenig Decl. ¶ 14),
8  during which it requested a list of claims Dr. Salkin
9  submitted to his health insurer (Koenig Decl. ¶ 15).
10
11     Dr. Salkin's health insurer responded with a list of
12  claims for payment to physicians including Dr. Hamid R.
13  Salari-Namin, Dr. Andrew S. Janik, and Dr. Ryszard
14  Skulski (Ex. E to Koenig Decl.), prompting USAA to
15  request medical records from those doctors (Koenig Decl.
16  ¶ 17).  After receiving the records, USAA concluded that
17  Dr. Salkin made material misrepresentations in his
18  application for health insurance, returned his premiums,
19  and rescinded his policy.  (See Ex. G to Koenig Decl.)
20
21     This lawsuit, charging that USAA had no right to
22  rescind Dr. Salkin's policy, followed.  Having engaged in
23  discovery, USAA now moves for summary judgment on all
24  three claims made against it, i.e.:  (1) that it breached
25  a contract by rescinding Dr. Salkin's policy; (2) that it
26  concurrently breached the covenant of good faith and fair
27  dealing, and; (3) that its rescission of the policy
28

entitles the Salkins to damages under California Civil Code § 1692.  (See generally Motion.)

The Salkins filed an Opposition (Doc. No. 36), arguing USAA waived its right to rescind Dr. Salkin's policy by not underwriting it properly in the first place.  (Opp'n at 8-16.)  They further argue Dr. Salkin made no misrepresentations, or alternatively, any misrepresentations were immaterial.  (Id. at 16-20.)  The Salkins also contend that USAA has engaged in what amounts to impermissible post-claim underwriting.  (Id. at 20-22.)  USAA filed a Reply (Doc. No. 43), and this matter is now ripe for decision under the following legal standard.

## II. LEGAL STANDARD

A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment.

1   <u>Margolis v. Ryan</u>, 140 F.3d 850, 852 (9th Cir. 1998);

2   <u>Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.</u>, 707

3   F.2d 1030, 1033 (9th Cir. 1983).  The moving party bears

4   the initial burden of identifying the elements of the

5   claim or defense and evidence that it believes

6   demonstrates the absence of an issue of material fact.

7   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

8

9       When the non-moving party has the burden at trial,

10  however, the moving party need not produce evidence

11  negating or disproving every essential element of the

12  non-moving party's case.  <u>Celotex</u>, 477 U.S. at 325.

13  Instead, the moving party's burden is met by pointing out

14  there is an absence of evidence supporting the non-moving

15  party's case.  <u>Id.</u>

16

17      The burden then shifts to the non-moving party to

18  show that there is a genuine issue of material fact that

19  must be resolved at trial.  Fed. R. Civ. P. 56(e);

20  <u>Celotex</u>, 477 U.S. at 324; <u>Anderson</u>, 477 U.S. at 256.  The

21  non-moving party must make an affirmative showing on all

22  matters placed in issue by the motion as to which it has

23  the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 322;

24  <u>Anderson</u>, 477 U.S. at 252; <u>see also</u> William W. Schwarzer,

25  A. Wallace Tashima & James M. Wagstaffe, <u>Federal Civil</u>

26  <u>Procedure Before Trial</u>, 14:144.  "This burden is not a

27  light one.  The non-moving party must show more than the

28

12

mere existence of a scintilla of evidence." <u>In re Oracle Corp. Securities Litigation</u>, 627 F.3d 376, 387 (9th Cir. 2010) (citing <u>Anderson</u>, 477 U.S. at 252).  "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." <u>In re Oracle</u>, 627 F.3d at 387 (citing <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson</u>, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. <u>Barlow v. Ground</u>, 943 F.2d 1132, 1135 (9th Cir. 1991); <u>T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630-31 (9th Cir. 1987).

## III. DISCUSSION

USAA can only prevail on its Motion for Summary Judgment if it shows that it rescinded Dr. Salkin's policy rightfully, because there is no genuine issue of fact as to whether Dr. Salkin made material misrepresentations when he applied for his insurance policy. <u>See</u> Cal. Ins. Code § 331 ("Concealment, whether intentional or unintentional, entitles the injured party

to rescind insurance."); Nieto v. Blue Shield of Cal. Life & Health Ins. Co., 181 Cal. App. 4th 60, 75-77 (2010) ("'Governing law permits an insurer to rescind a policy when the insured has misrepresented or concealed material information in connection with obtaining insurance.'") (quoting TIG Ins. Co. of Mich. v. Homestore, Inc., 137 Cal. App. 4th 749, 755-56 (2006)). USAA carries that burden successfully.

The California Insurance Code creates a "statutory framework that imposes 'heavy burdens of disclosure' 'upon both parties to a contract of insurance, and any material misrepresentation or the failure, whether intentional or unintentional, to provide requested information permits rescission of the policy by the injured party.'" Mitchell v. United Nat. Ins. Co., 127 Cal. App. 4th 457, 468 (2005) (quoting Imperial Cas. & Ins. Co. v. Sogomonian, 198 Cal. App. 3d 169, 179-80 (1980)). "Materiality," in turn, "is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries." Cal. Ins. Code § 334. In other words, a representation is material if it would have had an effect on USAA's underwriting, and not whether it would have affected the underwriting of "some 'average reasonable'

14

1  insurer."  Imperial Cas. & Ins. Co., 198 Cal. App. 3d at

2  181; see also Nieto, 181 Cal. App. 4th at 920.

3

4      USAA argues that Dr. Salkin misrepresented his

5  medical history in the application process when he told

6  the interviewer, among other things:  (1) he had no

7  medical records; (2) he never consulted a health care

8  provider for assistance with a mental disorder, and; (3)

9  he had no diagnostic tests in the preceding five years,

10 other than an EKG.

11

12     Dr. Salkin later admitted, however, to having

13 consulted a psychiatrist for obsessive-compulsive

14 disorder (M. Salkin Dep. 28:10-17, Apr. 15, 2011 (Ex. A

15 to Corby Decl.)), though he thought the problem so minor

16 as not to be worth disclosing to USAA (see id. 28:18-22).

17 He also admitted to having had an MRI that revealed

18 "really inconsequential lacunar infarcts." (Id. 31:17-

19 32:4.)  USAA defines "lacunar infarcts" as "strokes

20 caused by blocked arteries" (Mot. at 8).[4]  For their

21 part, the Salkins do not define "lacunar infarcts" at

22 all, though Dr. Salkin testified that he was told by the

23 medical professional who diagnosed them that they were

24 "really minor," and he therefore never thought to

25

26   _____

27      [4] An "infarct" is "[a] portion of tissue that has
    become stuffed with extravasated [effused] blood, serum,
    or other matter . . . ."  Oxford English Dictionary (2d
28 ed. 1989; online version Sept. 2011).

1   disclose them to USAA.   (M. Salkin Dep. 32:6-10.)

2   Presumably both Dr. Salkin's consultation of a

3   psychiatrist and his MRI resulted in the generation of

4   medical records, though Dr. Salkin told USAA he had

5   none.[5]

6

7       Citing <u>Thompson v. Occidental Life Insurance Co.</u>, 9

8   Cal. 3d 904, 916 (1973), the Salkins argue Dr. Salkin had

9   no obligation to disclose a minor ailment, and if he "had

10  no present knowledge of the facts sought, or failed to

11  appreciate the significance of information related to

12  him, his incorrect or incomplete responses would not

13  constitute grounds for rescission."   <u>Thompson</u>, 9 Cal. 3d

14  at 916.   The Salkins therefore contend Dr. Salkin had no

15  obligation to disclose either his psychiatric treatment

16  for obsessive-compulsive disorder or the MRI that

17  revealed his lacunar infarcts, and that USAA has no basis

18  for rescission if Dr. Salkin lacked knowledge of the

19  facts USAA sought or did not understand the significance

20  of its questions.

21

22      <u>Thompson</u> is, at first, a compelling analog to this

23  case, and therefore merits a full discussion.   In that

24  case, the insured, Thompson, was asked the following

25  _____

26      [5] Indeed, as the Court discusses, below, the Salkins'
    Opposition depends in part on the contention that USAA
27  should have discovered these records itself, an argument
    that assumes the records exist, despite Dr. Salkin's
28  representation.

multipart questions in the course of a medical
examination by a Dr. Epstein:

During the past five years have you:

[5]A.  Consulted, been examined, or been treated by any
physician or practitioner?

[5]B.  Had an X-ray, electrocardiogram or any laboratory
test or study?

[5]C.  Had observation or treatment at a clinic,
hospital, or sanitarium?

[5]D.  Had or been advised to have a surgical operation?

. . .

Have you ever had or been told you had: . . .

[6]B. . . . pain or pressure in the chest, or any
disorder of the heart, blood or blood vessels?

[6]C. . . . any disorder of the lungs, bronchial tubes,
throat or respiratory systems?
. . .

[6]I.  Any disease, condition or disorder not indicated above?

Thompson, 9 Cal. 3d at 914-15.

In response to questions 5 A-D, Dr. Epstein recorded that Thompson had "[v]ein ligation - hernia - Providence Hosp. Oakland, 1963, M.C. Green MD 330 Elm St., Oakland, Cal."  Id. at 915.  In response to questions 6 B, C, and I, however, Dr. Epstein recorded negative responses.  Id. Thompson died after slipping and falling into his bathtub, id. at 909, but his insurer, Occidental Life Insurance Co., refused to honor his policy, id. at 910. Thompson's wife sued.  Occidental lost at trial and appealed, id., arguing among other things that any contract with Thompson was rendered unenforceable due to misrepresentations he made to Dr. Epstein, id. at 914-15. Specifically, Thompson failed to tell Dr. Epstein that in the two months leading up to the medical examination, he had "approximately 10 medical consultations . . . with five different doctors," in which "he (1) had complained of chest pain, (2) had an electrocardiogram performed, (3) was treated for 'phlebitis' (vein inflammation), . . . . (5) had his legs X-rayed . . . , and (6) was advised to undergo a 'chemical sympathectomy' . . . ."  Id. at 915.

1     The California Supreme Court nevertheless affirmed
2  the judgment against Occidental.  First, it observed that
3  many of the omitted items "appear to relate to the
4  ailment which Thompson affirmatively disclosed in
5  answering question 5," and therefore "the trial court
6  might have concluded that it was the responsibility of
7  the examining doctor to elicit additional details."  Id.
8  at 917.  It also noted that "none of the physicians with
9  whom [Thompson] consulted testified that [Thompson] was
10 ever advised that he had arteriosclerosis" – another
11 condition Occidental argued that Thompson failed to
12 disclose – and one of Thompson's physicians testified
13 that he purposefully was vague with Thompson about his
14 medical condition to avoid worrying him.  Id. at 917.
15 Thus, the trial court could have concluded "that Thompson
16 believed that he had a single leg circulation problem,"
17 and that he disclosed the problem properly.  Id.  The
18 court further posited "that Thompson, as an ordinary
19 layman, failed to recollect or appreciate the
20 significance of the subject matter of the various . . .
21 consultations," and the technical diagnoses that resulted
22 therefrom "might well have been meaningless jargon to
23 him."  Id. at 918.  In any event, the court added, the
24 trial court "may have found that most of Thompson's
25 undisclosed problems related to 'minor indispositions'
26 rather than serious ailments . . . ."  Id.
27
28

1    The unduly broad view of the holding in <u>Thompson</u>
2  urged by the Salkins collides with the principle that
3  even an unintentional misrepresentation can be the basis
4  for rescission of an insurance policy.  Under that
5  standard, whether the insured appreciated the
6  significance of the questions is irrelevant unless,
7  perhaps, the question itself was vague.  Adding another
8  exception sketched out in <u>Thompson</u>, that an insured can
9  also assess the severity of his own ailments to determine
10  whether they meet an (undefined) threshold for reporting,
11  <u>Thompson</u> swallows entirely the rule that any material
12  misrepresentation is a basis for rescission.  To make
13  sense in the context of California's insurance law,
14  <u>Thompson</u> needs a limiting principle.

15

16    USAA offers one, from a case predating, but not
17  overruled by, <u>Thompson</u>.  In <u>San Francisco Lathing Co. v.</u>
18  <u>Penn Mut. Life Ins. Co.</u>, 144 Cal. App. 2d 181, 186
19  (1956), the court held that "when [an] applicant is asked
20  specific questions as to his medical history," as opposed
21  to "generally whether he has had or been treated for any
22  disease or ailment," "the failure to refer to temporary
23  or minor indispositions" will not be excused.

24

25    In this case, Dr. Salkin was asked whether he had
26  ever consulted a physician regarding a nervous system
27  disorder, and though he admits consulting a psychiatrist
28

1  regarding obsessive-compulsive disorder, he told USAA he

2  never consulted anyone at all.[6]  Dr. Salkin was asked

3  whether he had certain diagnostic tests within the last

4  five years, interrupted the interviewer to volunteer that

5  he had an EKG, and then said he had no other tests – not

6  that the results of the other tests were insignificant,

7  but that they never occurred.  Finally, and most

8  critically, Dr. Salkin volunteered that he had no medical

9  records at all.  He did so in a peremptory response to a

10  question about whether USAA had his authorization to

11  request medical records from any healthcare providers who

12  treated him.  Answering whether one has medical records

13  is not a question that calls in any realistic way for the

14  exercise of one's judgment; either the records exist or

15  they do not.[7]  Consequently, Dr. Salkin made at least one

16  _____

17      [6] USAA asked Dr. Salkin whether he sought treatment
   for a mental disorder, not whether it was a severe
18  disorder.  In Thompson, the court was lenient towards a
   layman's failure to realize that his ailments should have
19  been reported in response to a question more general than
   the one USAA asked Salkin.  USAA's question was specific,
20  however, and Dr. Salkin is not a layman.  Of course, as a
   physician, Dr. Salkin may have brought a different bias
21  to the process than would a layman, basing his responses
   on his own assessment of the underlying severity of his
22  problems, rather than simply answering the questions he
   was asked.  Nevertheless, when presented with specific
23  questions, Dr. Salkin's judgment should have had little
   role in his response.

24      [7] At the hearing on this Motion, the Salkins' counsel
   argued that the Court should grant the Salkins the
25  benefit of the inference that Dr. Salkin only meant that
   he had no medical records in his possession, or was
26  merely reiterating that his self-diagnosis of high blood
   pressure generated no medical records.  In the context of
27  the entire conversation, however, that inference is
28                                      (continued...)

21

1  representation that cannot be excused by even the

2  broadest reading of Thompson.

3

4      Even assuming Dr. Salkin should have disclosed his

5  MRI, or his psychiatric treatment, or the existence of

6  his medical records, the Salkins argue those failures are

7  waived as grounds for rescission by USAA's failure to

8  make a proper investigation of Dr. Salkin's medical

9  history.  USAA's initial failure to investigate Dr.

10 Salkin's medical history properly, the Salkins assert,

11 makes its subsequent investigation and rescission of Dr.

12 Salkin's policy an example of unlawful post-claim

13 underwriting.

14

15     The Court disagrees.  The Salkins contend that

16 California law required USAA to conduct an underwriting

17 investigation robust enough to have belied Dr. Salkin's

18 representations, and whether USAA did so is, according to

19 the Salkins, a disputed question of fact.  See Hailey v.

20 Cal. Physicians' Serv., 158 Cal. App. 4th 452, 469 (2007)

21 ("[W]e interpret 'medical underwriting' to require a plan

22 to make reasonable efforts to ensure a potential

23 subscriber's application is accurate and complete. . . .

24 This will usually present a question of fact.").

25 _____

26     [7](...continued)
   unreasonable.  In deciding a motion for summary judgment,
27 the Court need only grant the non-movant the benefit of
   reasonable inferences.  Barnes v. Arden Mayfair, Inc.,
28 759 F.2d 676, 680 (9th Cir. 1985).

1  California law imposes no such requirement on USAA in
2  this case.  See Nazaretyan v. Cal. Physicians' Serv., 182
3  Cal. App. 4th 1601, 1608 (2010) (distinguishing Hailey on
4  the grounds that a health care service plan's basis for
5  rescinding a health plan contract is governed by a
6  different statutory provision, and therefore by different
7  requirements, than an ordinary insurer's basis for
8  rescinding an insurance policy) (citing Nieto, 181 Cal.
9  App. 4th at 65, 75-77).
10
11      Assuming USAA was required to make some further
12  investigation, Dr. Salkin's protestation in his
13  application interview that there would be no records for
14  USAA to discover undercuts the Salkins' argument that
15  "[c]learly USAA could have obtained Dr. Salkin's medical
16  records," because "Dr. Salkin's life insurance
17  application contains an authorization allowing USAA to do
18  just that."  (Opp'n at 15.)  While "USAA had no problem
19  pulling Dr. Salkin's health claims history and obtaining
20  his medical records during the rescission investigation"
21  (id.), it did so after receiving from Mrs. Salkin a list
22  of health care providers who treated Dr. Salkin and the
23  name of the health insurer to which Dr. Salkin was
24  submitting his medical claims.  Accord DiPasqua v. Cal.
25  W. States Life Ins. Co., 106 Cal. App. 2d 281, 284-85
26  (1951) (forbidding an insurer from rescinding a policy
27  when, prior to its issuance, the insurer had in its
28

1  possession both a medical records release and the name of

2  a facility that treated the insured – items that would

3  have allowed it to discover the insured's

4  misrepresentations easily).

5

6      The Salkins put forth many other reasons why USAA's

7  underwriters should have noticed something was amiss,

8  based on other statements Dr. Salkin made in his

9  interview and the results of his tests.  The Court finds

10 the rigors of USAA's underwriting procedures, or what it

11 would have, could have, or should have done, are not at

12 issue, when:  (1) a material misrepresentation in an

13 application, whether intentional or not, is a sufficient

14 basis to rescind an insurance policy, and; (2) at least

15 one of the misrepresentations in this case (i.e., that

16 Dr. Salkin had no medical records) had the effect of

17 stymying further investigation, see Lunardi v. Great-West

18 Life Assurance Co., 37 Cal. App. 4th 807, 822 n.9 (1995)

19 (noting that an insured cannot withhold information and

20 then fault his insurer for not discovering it).

21

22     Dr. Salkin neglected to inform USAA properly of facts

23 material to processing an application for life insurance.

24 Even if he did so because he genuinely believed that the

25 information he withheld was immaterial, that was not Dr.

26 Salkin's determination to make.  This is particularly so

27 because at least one representation, that Dr. Salkin had

28

no medical records, discouraged USAA from eliciting those records from Dr. Salkin's treating physicians. Accordingly, the Court concludes there is no genuine dispute of material fact as to whether Dr. Salkin made material misrepresentations to USAA.  The Court therefore GRANTS USAA's Motion for Summary Judgment as to the Salkins' claim that USAA breached a contract with Dr. Salkin by rescinding his insurance policy.

The Salkins also oppose summary judgment on their claim for breach of the covenant of good faith and fair dealing; however, because that claim is intertwined with their claim for breach of contract, which fails, the Court need not address the arguments supporting the Salkins' position.  See San Diego Housing Comm'n v. Indus. Indem. Co., 68 Cal. App. 4th 526, 544 (1998) ("Where a breach of contract cannot be shown, there is no basis for finding a breach of the covenant.") (citing Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 35-36 (1995)).  USAA is also entitled to summary judgment as to that claim.  The Salkins' claim for relief from rescission under California Civil Code § 1692 fails because it too depends on the breach of contract claim, it is undisputed that USAA returned the Salkins' premiums, and finally, the Salkins did not oppose USAA's Motion as to that claim.  Finally, the Salkins' request for punitive damages is denied as moot, as no claims

1  remain for which punitive damages may be assessed.

2  USAA's Motion is therefore granted in full.

3

4                    **IV. CONCLUSION**

5       For the foregoing reasons, the Court GRANTS USAA's

6  Motion for Summary Judgment.

7

8

9

10  Dated: <u>December 19, 2011</u>

11                         VIRGINIA A. PHILLIPS
                           United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28